# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

CHARLOTTE K.[1],

                               Plaintiff,

       v.                                      3:17-CV-642 (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                               Defendant.

---

PETER A. GORTON, ESQ., for Plaintiff
PETER JEWETT, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 6).

## I.    PROCEDURAL HISTORY

Plaintiff filed applications for Disability Income Benefits ("DIB") and Supplemental Security Income ("SSI") on August 23, 2011, alleging disability beginning December 20, 2009. (Administrative Transcript ("T") 26, 177-90). Plaintiff's applications were denied initially on April 6, 2012. (T. 87-89). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

April 30, 2013. (T. 44-86).  ALJ John P. Ramos issued an order on May 28, 2013, finding that plaintiff was not disabled under the Social Security Act. (T. 26-39).  The Appeals Council denied review on September 5, 2014. (T. 1-6).

Plaintiff filed a civil action in the Northern District of New York, challenging the Commissioner's decision. *K. v. Comm'r of Soc. Sec.*, 3:14-CV-1159 (DNH/ATB).  On April 20, 2015, the parties stipulated to a remand of 14-CV-1159 for further administrative proceedings, which was so-ordered by the court on April 21, 2015. (Dkt. Nos. 13, 14-15 in 14-CV-1159).  On January 4, 2016, the Appeals Council issued an order, remanding the case to ALJ Ramos for further proceedings. (T. 898-900).

ALJ Ramos held another hearing on February 16, 2017, at which plaintiff appeared with counsel, and at which the ALJ heard the testimony of a Vocational Expert ("VE"). (T. 838-62).  On March 31, 2017, the ALJ issued a decision finding that plaintiff was not disabled. (T. 813-29).  The ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 404.984(a).  This action followed.[2]

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[2] After the ALJ's decision on remand, the Appeals Council may assume jurisdiction of the case after written exceptions by the claimant or may assume jurisdiction without written exceptions. 20 C.F.R. § 404.984(a), (c). However, if the claimant does not file exceptions, and the Appeals Council does not assume jurisdiction within the appropriate time limit, claimants who disagree with a decision on remand by the ALJ may immediately file their federal action, challenging the Commissioner's denial of benefits. 20 C.F.R. § 404.984(d).

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing

3

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ

explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff alleges that she is disabled due to the combination of various mental and physical impairments, including rheumatoid arthritis; cervical and lumbar impairments; the effects of HIV infection; anxiety; depression; post traumatic stress disorder ("PTSD"); status post knee fracture; and panic disorder. On February 16, 2017, at plaintiff's second hearing, the ALJ asked plaintiff to "update" her condition, and her medical providers.[3] (T. 842). Plaintiff testified that she was currently being treated by Certified Nurse Practitioner ("CNP") Scott Rosman, Family Nurse Practitioner ("FNP") Kelly Miller, and Licenced Certified Social Worker ("LCSW") Patricia Jordan. (T. 843).

There are several other medical providers with whom plaintiff has treated and who were discussed by the ALJ. Plaintiff has been treated by Henda Bouali, M.D.[4] for her rheumatoid arthritis; and Psychologist Christopher Yanusas for mental impairments. Plaintiff has had consultative examinations by Dr. Mary Ann Moore, Psy.D. for plaintiff's mental impairments (T. 411-15); and Doctor of Osteopathy ("DO") Lawrence Wiesner (T. 566-68) and Dr. Justine Magurno, M.D. (T. 417-21) for her physical

---

[3] Plaintiff's first hearing was in April of 2013. Understandably, because the second hearing was in 2017, the ALJ asked if plaintiff's condition had changed since she first appeared.

[4] FNP Miller works in Dr. Bouali's office. (T. 844).

impairments. Plaintiff's records were reviewed by a non-examining expert, psychiatrist Dr. E. Kamin, who also filed a mental RFC evaluation in addition to a narrative report. (T. 518-20).

At the 2017 hearing, plaintiff testified that she was no longer taking medications for the rheumatoid arthritis and other "osteo" impairments. (T. 844-45). Plaintiff stated that she stopped taking the prescription medications a "few years" ago because the medication she was taking - Plaquenil - could "make you go blind." (T. 845). Plaintiff testified that she was trying herbal remedies, and that her health care providers were aware of the switch. (T. 845). Plaintiff testified that both CNP Rosman and Dr. Bouali had "seen good results" from the herbal remedies, so they told her to continue taking them for now. (*Id.*) Plaintiff later testified that CNP Rosman was considering prescribing HIV medication that could also help alleviate the arthritis flare-ups. (T. 848).

Plaintiff did state that she took some prescription medications, but not on a "regular every day basis." (T. 845) Plaintiff took Tramadol, Robaxin, and Gabapentin for her back "issues," but only when the pain was so severe that she could not get off the couch or get out of bed for days, and she should probably go to the emergency room. (*Id.*) She estimated that this level of pain would occur once per month. (*Id.*) Plaintiff also testified that she believed that her condition was worse than when she first appeared before the ALJ. (T. 846). Plaintiff testified that she had "bouts" when her condition is worse. She stated that her house was a mess, she could not do dishes, she had been having a lot of anxiety attacks, and she even had to have someone accompany

6

her to the store. (*Id.*)

Plaintiff stated that the past year had been difficult for her, so she believed that her mental condition was worse. Plaintiff stated that she had trouble getting around because Medicaid wanted her to use the bus, but using the bus to attend her appointments with LCSW Jordan was not "feasible," and that when she tried to use the bus, she sometimes had panic attacks and would need get off. (T. 847). Taking the bus was also very difficult in the winter. (*Id.*) A friend has tried to help her, but plaintiff still has had to cancel some appointments. (*Id.*)

VE Margaret Heck testified at the 2017 hearing. (T. 849-60). The VE discussed the requirements of plaintiff's previous grocery clerk and teacher's aide work. (T. 852-53). These jobs are considered semi-skilled, and because plaintiff's RFC as determined by the ALJ, restricted plaintiff to unskilled work, she would not be able to perform either job, even without considering plaintiff's other impairments. (T. 853). Thus, the ALJ proceeded to step five of the sequential evaluation.

The first hypothetical question asked the VE to assume that plaintiff could perform light work, but should not perform frequent fine manipulation, such as repetitive hand/finger actions, fingering, or feeling with either hand, but she retained the ability to grasp, hold, turn, and raise and lower objects with either hand. (T. 853). Mentally, plaintiff would have the ability to understand and follow simple, one and two-step instructions and directions and could perform one and two-step tasks with supervision and independently. (*Id.*) Plaintiff could maintain attention and concentration for work "consisting of one and two-step tasks," and could regularly

7

follow a routine and maintain a schedule. Plaintiff could frequently relate to, and interact appropriately with, supervisors and coworkers, "to the extent necessary to carry out simple tasks." (T. 853). Plaintiff could handle reasonable levels of simple, repetitive work-related stress and could make decisions, directly related to the performance of simple work, involving one or two-step tasks. She could tolerate usual workplace changes and interactions with co-workers and supervisors, associated with the simple work, in which plaintiff was not responsible for supervising the work of others. (T. 853-54).

In response to that hypothetical question, the VE testified that two jobs would be available in the light work area - usher and dealer account investigator. (T. 854). The ALJ asked a second hypothetical question, which contained additional restrictions involving the use of plaintiff's hands. (T. 855). The ALJ asked the VE to assume that the plaintiff could not "frequently grasp, hold, turn, raise and lower objects with either hand." (*Id.*) The VE stated that the additional restrictions would not change the availability of the jobs she found available in response to the first RFC hypothetical. (*Id.*) The VE noted that the Dictionary of Occupational Titles ("DOT") did not collect information under "grasping." Grasping is defined under "handling and fingering." (*Id.*) But the VE sated that this small change in definition would not "change anything." (*Id.*)

There was also a discussion about time "off task" and about "unscheduled absences." (T. 855-86). The VE testified that "most" employers could tolerate a worker being "off task" 10-15% of the time, but anything over that would not be allowed. (T.

855). Employers would "typically tolerate one to two unexcused absences" on a monthly basis, but that anything over that number would not be allowed. (T. 866). The VE stated that most of the information was "consistent with the DOT and its companion publications," but her answers regarding "time off task" and "absenteeism" were based on the VE's own experience, "because the DOT does not address that." (*Id.*) The VE stated that unscheduled absenteeism is very "employer-specific." (T. 857).

Plaintiff's counsel has included a detailed description of the facts, which the defendant has adopted, with the exception of any arguments, inferences, or conclusions. (Def.'s Br. at 2). In addition, both of the ALJ's decisions provide detailed statements of the medical evidence of record, which defendant has also adopted. (Def.'s Br. at 2) (T. 26-39, 813-29). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV.   THE ALJ'S DECISION

After finding that plaintiff met the insured status for DIB through December 31, 2014, the ALJ found that plaintiff did not engage in substantial gainful activity ("SGA") since her alleged disability onset date of December 20, 2009. (T. 815). At step two of the sequential evaluation, the ALJ found that plaintiff had the following severe impairments: a history of degenerative joint disease ("DJD") and lateral tibial plateau fracture of the left knee; a history of rheumatoid arthritis; post traumatic stress syndrome ("PTSD"); panic disorder; and adjustment disorder. (T. 815).

The ALJ also determined that plaintiff had multiple impairments that were not severe. (T. 816). These impairments include neck, low back, and shoulder pain;

obesity; allergic rhinitis, asthma, and tobacco abuse; anemia; endometriosis; HIV and HIV infection; abdominal pain; cholecystectomy; insomnia; headaches; and dental pain. (*Id.*) The ALJ stated that although plaintiff had been "medically managed" for the above impairments, they were only "briefly mentioned" in the record, and there was insufficient documentation for these impairments to rise to the level of severe impairments. (*Id.*) The ALJ discussed each of the impairments that he found were not severe and cited to the parts of the record which supported his findings. (*Id.*)

At step three of the sequential evaluation, the ALJ found that plaintiff's impairments did not meet or equal the severity of listed impairments. (T. 816-20). In making this determination, the ALJ considered Listing 1.02(A) (major disfunction of a joint - hip, knee, or ankle - due to any cause). (T. 817). Because plaintiff can ambulate effectively, notwithstanding her impairments, the requirements of this listing were not met.[5] (*Id.*) The ALJ also considered Listing 14.09 (inflammatory arthritis). (*Id.*) The listing requires persistent inflammation or persistent deformity of one or more peripheral weight-bearing joints and must result in an inability to either ambulate effectively (lower body) or to perform fine and gross movements effectively (upper body). The ALJ found that plaintiff could ambulate effectively and "effectively" perform fine and gross movements with her upper extremities. (T. 817).

The ALJ also considered plaintiff's mental impairments at step three. (*Id.*) The ALJ considered Listings 12.04 (depressive, bipolar, and related disorders) and 12.06

---

[5] There are other requirements in section 1.02. However, ultimately, the listed impairment must result in an inability to ambulate effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02(A). If the plaintiff can ambulate effectively, it is unnecessary to consider the remaining symptoms.

(anxiety and obsessive compulsive disorders). (T. 817-18). The ALJ reviewed plaintiff's mental health records and determined that plaintiff did not meet the requirements for either listed impairment, finding that while plaintiff has moderate limitations in understanding, remembering, or applying information, and in concentration, persistence, and pace, she has only mild limitations in interacting with others and in her ability to adapt or manage herself. (T. 818-19). The ALJ found that plaintiff's impairments were not listing severity because the "paragraph B" criteria were not satisfied, i.e. plaintiff did not have "at least two 'marked' limitations or one 'extreme' limitation." (T. 820). In addition, no state agency psychological consultant found that plaintiff's impairments met or equaled the severity of a listed impairment. (T. 820). The ALJ considered "paragraph C" of the Listing of Impairments, but found that the record did ***not*** establish that plaintiff had only a minimal capacity to adapt to changes in her environment or to demands that were not already a part of her life. (*Id.*)

At the end of the step three analysis, the ALJ recognized that the limitations in "paragraph B" of the listings were only used to rate the severity of mental impairments at steps two and three, and did not constitute an RFC determination. (T. 820). The mental RFC assessment required a "more detailed assessment," and the ALJ's later RFC determination reflected "the degree of limitation" found in the paragraph B functional analysis. (*Id.*)

The ALJ determined that plaintiff would be able to perform light work, with several physical and mental restrictions. (*Id.*) The ALJ found that plaintiff should not perform frequent fine manipulation, such as repetitive hand-finger actions, fingering or

feeling with either hand. (*Id.*) In addition, plaintiff could not frequently grasp, hold, turn, raise and lower objects with either hand. (*Id.*) Mentally, the ALJ found that plaintiff retained the ability to perform work which involves simple one to two-step tasks, including the ability to understand and follow the directions involved, the decisions and stress related to such work, and the attention and concentration to complete such work, as long as she was not supervising the work of others. (*Id.*) The ALJ stated that his RFC determination was made considering all of the evidence, including the limitations and restrictions that were imposed as the result of the "combination" of all her medically determinable impairments. (*Id.*)

The ALJ found that, although plaintiff's impairments were likely to cause pain or symptoms, the plaintiff's statements about the intensity and/or persistence of these symptoms were not supported by the objective medical evidence in the record. (T. 821). In such cases, the ALJ stated that he was required to consider "other evidence" of record to determine if the plaintiff's symptoms limited plaintiff's ability to do work-related activities. (*Id.*) The ALJ then reviewed plaintiff's alleged limitations and stated that he considered third-party letters[6] in conjunction with these claims, but ultimately found that plaintiff's symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (T. 822). The ALJ found that "these statements"[7]

---

[6] Plaintiff submitted letters, written by a friend, plaintiff's boyfriend, and a case manager in support of plaintiff's claim of disabling symptoms. (T. 821). The ALJ gave no evidentiary weight to these letters because they were "interested" parties who were not acceptable medical sources. (T. 825). However, the ALJ did consider the letters "as part of the overall record, including the claimant's allegations and credibility." (*Id.*)

[7] It appears that the ALJ was referring to plaintiff's allegations of disabling pain as well as the third-party letters, describing plaintiff's symptoms. (T. 821-22).

12

were found to affect plaintiff's ability to work, "only to the extent that they can reasonably be accepted as consistent with the objective medical and other evidence." (T. 822).

The ALJ examined all the requirements of light work, together with plaintiff's additional limitations and assigned relative weight to all the medical evidence that he considered. (T. 822-27). The ALJ gave "significant" weight to the consultative report of Justine Magurno, M.D., who examined plaintiff in 2012. (T. 823). The ALJ cited to Dr. Magurno's report, in which she found moderate limitations in plaintiff's hands, but mild limitations in plaintiff's ability to stand and walk due to knee arthritis.[8] Plaintiff had moderate limitations for squatting and bending." (*Id.*) The ALJ gave little weight to reports authored by Dr. Henda Bouali, M.D., treating FNP Kelly Miller, and treating CNP Scott Rosman. (T. 823). The ALJ gave these opinions little weight, to the extent that they found that plaintiff would be required to change positions once per hour (or every 30 minutes), would be absent four or more times per month, would only be able to sit for 4 hours out of an 8-hour day, would not be able to lift more than 10 pounds, and would have medication side effects that disrupted plaintiff's ability to concentrate or maintain work pace. (T. 823-24). The ALJ stated that these restrictive opinions were

---

[8] In a report, dated July 24, 2011, Dr. Christine Blonski, D.O., who plaintiff was seeing for her knee injury, noted that the injury was improving with conservative measures, and that any pain that she was experiencing may have been due to some degenerative disease in her back. (T. 344). Dr. Blonski's examination of plaintiff's left knee showed no joint effusion, and full active range of motion, although she had moderate crepitus with patellar glide. (T. 344). There was no pain with patellar compression and no pain over the medial or lateral joint lines. Distal neurovascular status of the left lower extremity was otherwise "intact grossly." (*Id.*) Plaintiff was referred to Dr. Blonski's partner Annette Smith, M.D. for further evaluation of her back. (*Id.*) Plaintiff subsequently underwent a nerve block for her back administered by Dr. Smith. (T. 342-43).

not consistent with the "longitudinal evidence" and with the medical professionals' own treatment notes. (T. 824). The ALJ then engaged in a lengthy analysis of why he made the above determination. (T. 824-25).

The ALJ gave some weight to reports issued for Workers' Compensation purposes,[9] but stated that the reports were considered only for their clinical and diagnostic findings as well as functional limitations, not for any "conclusory" statements regarding disability under Workers' Compensation guidelines, because such rules are not binding on the Social Security Administration. (T. 825). The ALJ gave "very little weight" to the "Independent Medical Report," written by Dr. Lawrence Wiesner, DO. (T. 825). The ALJ found that this report was based on the findings of a non-treating source, and was not consistent with the medical record. (*Id.*)

In supporting his RFC regarding plaintiff's mental impairments, the ALJ cited to the 2013 United Health Services ("UHS") report by Christopher J. Yanusas Ph.D. (T. 825-26 & 707-709). The ALJ also relied upon Dr. E. Kamin, a psychological consultant, who opined that plaintiff is able to perform unskilled work. (T. 826). The ALJ cited Dr. Kamin's programmatic expertise, the doctor's review of the plaintiff's medical records, and the consistency of Dr. Kamin's opinion with the overall evidence. (T. 826). The ALJ cited a report by Dr. Mary Ann Moore, Psy.D., who found that

---

[9] Plaintiff's knee injury was sustained at work as a teacher's aide on January 5, 2010, when she was kicked in the knee by a student. (*See* T. 283). Most of the reports are written by Dr. Blonski. (T. 282-314, 344-61). The court notes that, at least one of the reports indicates that plaintiff was "assigned a scheduled loss of use to her left lower extremity 15% and she reports that her workmen's comp case is still open for medical coverage going forward." (T. 346). The ALJ cited these reports in his decision, but noted that the statements regarding disability percentage were not considered to determine "disability" because the standard for Workers' Compensation is different than the standard for SSA disability.

plaintiff is able to follow and understand simple directions, consistently learn and perform simple tasks, and has generally intact attention and concentration skills with only mildly impaired memory and concentration skills. (T. 826 & 411-16). The ALJ gave little weight to the report authored by Patricia Jordan, LCSW, because her opinion that plaintiff would have a "more than slight" limitation in her ability to interact appropriately with the general public, and a "marked" limitation in her ability to get along with co-workers and peers, was not consistent with the longitudinal medical record as well as her own treatment notes. (T. 826-27). Finally, the ALJ also mentioned plaintiff's obesity and noted that every examiner who offered an opinion as to her RFC made note of her weight, and thus, "their opinions necessarily considered the claimant's obesity." (T. 827).

The ALJ then determined that plaintiff's current RFC would not allow her to perform her past relevant work as a grocery store clerk or teacher's aide. (T. 827). The ALJ moved to step 5 of the sequential evaluation, and considered the VE's testimony based on the second hypothetical question posed at the hearing. (T. 828-29). The ALJ concluded that plaintiff would be able to perform two of the three jobs listed by the VE.[10] (T. 828). Therefore, the ALJ found the plaintiff not disabled under the Act. (T. 829).

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.      The ALJ erred in failing to find that plaintiff's ability to work consistently

---

[10] The VE had also testified as to one additional job. However, based upon plaintiff's counsel's cross examination of the VE, the ALJ sustained counsel's objection to the third job. (T. 828).

was diminished by the combination of her physical and mental impairments. (Pl.'s Br. at 14-17) (Dkt. No. 11).

2.    The ALJ erred in failing to find that plaintiff requires a sit/stand option. (Pl.'s Br. at 17-18).

3.    The ALJ's determination regarding plaintiff's manipulative limitations is not supported by substantial evidence. (Pl.'s Br. at 18-21).

4.    The ALJ failed to give proper weight to the medical opinions of record. (Pl.'s Br. at 21-23).

5.    The ALJ's step five determination was not supported by substantial evidence. (Pl.'s Br. at 23-24).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 4-12) (Dkt. No. 13). For the following reasons, this court agrees with the defendant and will dismiss the complaint.

## VI.    RFC and WEIGHT OF THE EVIDENCE

### A.    Legal Standards

#### 1.    RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The ALJ must properly analyze the reasons that a report of a treating physician is rejected. *Halloran,* 362 F.3d at 32-33. An ALJ may not arbitrarily substitute his own judgment for competent

medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

The ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Application

Although plaintiff raises five separate claims, four of them may be analyzed under the heading of RFC. Essentially, plaintiff argues that in determining her RFC, the ALJ improperly weighed the medical evidence and erred in his determination that plaintiff could work consistently; did not require a sit/stand option; and erred in his assessment of plaintiff's manipulative limitations.

### 1. Consistency and Absenteeism

Plaintiff first argues that the combination of her mental and physical impairments, including medication side-effects, will prevent her from working "consistently," and that all of the medical providers who commented on the issue have found that her ability to work consistently has been diminished. (Pl.'s Br. at 14-17). Plaintiff argues that this analysis is crucial because the ALJ found only two jobs that plaintiff could perform, and the VE made it clear that if plaintiff were "off task" 15% of the time, or absent more than two days per month, there would be no jobs available to her. (Pl.'s Br. at 14-15). Plaintiff argues that the ALJ improperly found "no diminishment" in plaintiff's ability to work consistently, and did not consider any period of time off or absenteeism. (Pl.'s Br. at 15).

While the ALJ did not specifically comment on percentages of "diminishment," or discuss absenteeism, the ALJ relied upon some medical providers who had already taken plaintiff's limitations into account. The ALJ gave significant weight to the opinion of Dr. Kamin, a non-examining psychological consultant who opined the plaintiff was able to perform "unskilled work." (T. 520, 826). A non-treating specialist may rebut the treating physician's conclusions on the basis of independent analysis. *Anselm v. Commissioner*, No. 17-2948, __ F. App'x __, 2018 WL 2901334, at *2 (2d Cir. June 11, 2018) (citing *Garcia v. Colvin*, No. 14-CV-4798, 2015 WL 4603422, at *6 (E.D.N.Y. July 30, 2015)). A review of Dr. Kamin's report shows that he took plaintiff's difficulty dealing with stress, relating to others, and ***maintaining a regular schedule*** into account prior to making his conclusion that "alleged psychiatric

impairments are not of severity to interfere [with] daily activities or the performance of unskilled work." (T. 520). Dr. Kamin considered the consultative report, authored by Dr. Moore, who stated that plaintiff could follow and understand simple directions, perform simple rote tasks under supervision and "consistently" learn and perform simple tasks. (T. 826).

Plaintiff argues that one of Dr. Moore's statements, which appears at the end of her report, shows that plaintiff's psychiatric impairments significantly interfere with plaintiff's ability to "even function on a daily basis (let alone work),"[11] showing that Dr. Moore believed plaintiff to be disabled. However, as noted by the ALJ, the body of Dr. Moore's medical source statement finds that in addition to plaintiff's ability to follow simple directions and perform simple tasks "consistently," plaintiff showed "generally intact attention and concentration," and only a "mild impairment with memory and concentration." (T. 414, 826). Dr. Moore also stated that plaintiff had the ability to "learn simplistic and complex tasks, although it may take her slightly longer to learn and retain that complex information."[12] (T. 415).

While at the end of her report, Dr. Moore does state that plaintiff's examination was "consistent with psychiatric issues, which may significantly interfere with the claimants ability to function on a daily basis.," (T. 415), the court notes that the

---

[11] (Pl.'s Br. at 15).

[12] The ALJ did not find that plaintiff could follow complex instructions. He found that plaintiff could understand only "simple one and two step instructions" and could perform simple one and two-step tasks with supervision and independently. (T. 820). The ALJ also found that she could frequently relate to and interact appropriately with co-workers "to the extent necessary to carry out simple tasks." (T. 820).

definition of a "severe" impairment is one which "significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The body of Dr. Moore's report is more consistent with a finding that plaintiff's psychiatric impairments are "severe," in that they significantly impact plaintiff's ability to perform "basic work activities." It is arguable that Dr. Moore's statement is not intended to imply that plaintiff is totally disabled by her psychiatric impairments and cannot, as plaintiff argues, even function on a daily basis "let alone work." Dr. Moore also states that plaintiff's issues with stress, depression, and anxiety "may" cause problems relating adequately with others, making appropriate work decisions, or maintaining a regular schedule. (T. 415).

To the extent that Dr. Moore's concluding statement may be read to imply that plaintiff was "totally disabled," the ALJ may have also rejected this interpretation, based upon the remainder of Dr. Moore's report. Either way, the ALJ's determination is supported by substantial evidence. The ALJ may reject portions of a physician's report while adopting others. as long as the ALJ's conclusions are supported by substantial evidence in the record. *Matta v. Astrue*, 508 F. App'x 53, 56-57 (2d Cir. 2013) (although the ALJ's conclusion may not perfectly correspond with any of the medical source opinions cited in the decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole); *Veino v. Barnhart*, 312 F.3d 578, 588-89 (2d Cir. 2002) (ALJ did not err in crediting only a small part of treating physician's report). In addition, as stated above, Dr. Kamin specifically cited Dr. Moore's findings, indicating that he took them into consideration

when Dr. Kamin issued his report. (T. 520).

As noted by the ALJ, plaintiff's activities contradict more extreme limitations. The ALJ noted that plaintiff had a history of working at a children's home, was able to attend support group meetings, was able to attend medical appointments independently, and was able to paint and exhibit her artwork. (T. 825). The ability to complete a painting project, together with "generally intact attention and concentration," is inconsistent with an inability to stay "on-task."

None of the medical evidence indicates that plaintiff cannot "function" on a daily basis. The ALJ relied upon a Neuropsychological Evaluation, dated May 22, 2013, authored by psychologist Dr. Christopher J. Yanusas, Ph.D. (T. 825-26). Dr. Yanusas found that plaintiff suffered from "clinically significant symptoms of anxiety and depression, consistent with her history of PTSD, panic attack and depressed mood. (T. 709). Plaintiff was experiencing significant stressors because she lived in an unsafe neighborhood and had financial problems. (*Id.*) She demonstrated inconsistencies in "***complex attention*** and conceptual flexibility that appeared to be mediated by stress." (*Id.*) (emphasis added). When plaintiff's attention span fluctuated, her recent memory became less efficient in terms of organizing and learning information for later recall." Dr. Yanusas stated that his finding "appears to correlate with her report of problems with recent memory and multi-tasking." (*Id.*)

However, plaintiff had and IQ of 100, with a range of 95-105. (T. 826). She had adequate skills in orientation and expressive/receptive language. (T. 708). Plaintiff had average visual perception and constructive skills. average recent memory for novel and

abstract verbal information, "above average recent memory for visual information," higher level problem solving involving analogic, sequential, inductive and deductive reasoning skills with no time limit, and insight and judgment about her limitations. (T. 709). The ALJ also noted that the record did not demonstrate a mild or moderate disruption on plaintiff's ability to concentrate or maintain work pace due to the side effects of medication.[13] (T. 824).

The ALJ gave "little weight" to LCSW Jordan, who counseled plaintiff between December of 2012 and December 2014, and "currently" since June of 2016. (T. 827). In a questionnaire, dated April 25, 2013, LCSW Jordan found that plaintiff would have a "more than slight" limitation on her ability to interact appropriately with the general public and would have a "marked" limitation in her ability to get along with co-workers and peers. (T. 607-608). LCSW Jordan also checked a box in the questionnaire stating that plaintiff would have a marked limitation maintaining attention for extended periods of time. (T. 607). The ALJ found that these, and other, restrictive assessments were inconsistent with the clinical findings, objective evidence, and LCSW Jordan's own notes. (T. 827).

On January 10, 2013, LCSW Jordan wrote that plaintiff was having a stressful time regarding her living situation, but that she was "going out to a school to . . . discuss doing a presentation on HIV/Aids there. . . . One of [plaintiff's] strengths is that she is passionate about this subject and wants to educate others. Her enthusiasm for

---

[13] If plaintiff were having trouble concentrating, whether it was due to her mental impairments, the side effects of medication or both, arguably, this alleged difficulty would have been manifested in the psychological testing performed by Dr. Yanusas.

teaching and being an advocate is strong." (T. 545). This comment does not describe an individual who has a "marked limitation" in getting along with others. On January 15, 2013, although plaintiff was struggling with memory issues, she showed LCSW Jordan pictures of her art work "which were very good. . . . Her mood/affect were calm and pleasant and her outlook, positive." (T. 544). Even though plaintiff was having stress and anxiety relating to various subjects, on February 14, 2013, plaintiff told LCSW Jordan that she donated one of her paintings for an auction, and it sold for $100, which pleased her." (T. 542). Her mood/affect "were calm and pleasant but very low key at times." (*Id.*) On March 1, 2013, plaintiff told LSCW Jordan that she was disappointed that she missed a "function," because she could not afford to purchase appropriate clothes, and she confused some appointments, including a school where she was going to give a talk. (T. 541). LCSW Jordan commented that plaintiff "has become more involved in community outreach, something she enjoys." (*Id.*)

The ALJ's finding that LCSW Jordan's more extreme restrictions contained in the "check box" questionnaire were inconsistent with her treatment notes and the other medical evidence of record is supported by substantial evidence. In *Halloran v. Barnhart*, 362 F.3d 28, 31 n.2 (2nd Cir. 2004), the Second Circuit noted the "limited value of the standardized check-box forms, which are considered only marginally useful for purposes of creating a reviewable factual record." *See Sabater v. Colvin*, No. 12-CV-4594, at *5 n.6 (S.D.N.Y. Mar. 10, 2016) (citing cases, including *Halloran*, supra). There are cases, holding that check-the-box questionnaires are a proper format for a treating physician to express an opinion. *Goble v. Colvin*, No. 15-CV-6302, 2016

WL 3179901, at *5 (W.D.N.Y. June 8, 2016) (citations omitted). This court does not question that check-the-box forms are widely used and are not invalid simply because of the nature of the form; however, in this case, the questionnaire was inconsistent with LCSW Jordan's contemporaneous reports and the other evidence of record. Thus, the ALJ's decision to give little weight to LCSW Jordan's report is supported by substantial evidence.

There is no question that plaintiff has mental limitations, but the ALJ took these limitations into account when determining plaintiff's RFC by citing the reports of medical providers who had already taken the limitations into account in their opinions. The ALJ considered both positive and negative findings, weighing them and coming to a conclusion regarding plaintiff's RFC. The ALJ's RFC determination included significant restrictions on plaintiff's ability to function. Because plaintiff had trouble with complex instructions and multi-tasking, he restricted plaintiff to one or two-step tasks. The ALJ then found that plaintiff could handle "reasonable levels of repetitive work-related stress," and she could make decisions which related to "simple work," involving one or two step tasks. (T. 820, 825-26). It was the province of the ALJ to resolve the conflicts in the evidence and to determine plaintiff's RFC based on the evidence. *Anselm v. Commissioner*, No. 17-2948, __ F. App'x __, 2018 WL 2901334, at *3 (2d Cir. June 11, 2018) (citing inter alia *Veino v. Barnhart*, 312 F.3d at 588-89; *Mongeur*, 722 F.2d at 1038). The court defers to such resolution. *Id.* (citation omitted).

## 2. Physical Impairments

The same is true for the limitations imposed by plaintiff's physical impairments.

Plaintiff argues that the ALJ erred in failing to properly assess a sit-stand option in his RFC determination because treating specialist, Dr. Bouali, independent medical expert, Dr. Wiesner, and PA Roman all found that plaintiff needed to change positions frequently, and there are no opinions stating that plaintiff has no such limitations. (Pl.'s Br. at 18). Plaintiff argues that the plaintiff's necessity to change position so often is inconsistent with the ability to perform light work. (*Id.*)

The ALJ gave Dr. Wiesner's February 22, 2013 report "very little weight" because it was funded by the Broome County Department of Social Services, the opinions in his report were based upon one examination by a non-treating source, and the opinions are inconsistent with the medical evidence in the record. (T. 825). Dr. Wiesner stated that the plaintiff should not perform prolonged sitting, walking, or standing. (T. 567). In a "Work Capacities" questionnaire, he indicated that plaintiff should only sit, stand, or walk for ten minutes at a time and must have the opportunity to change positions at will. (T. 569). Dr. Wiesner also found that plaintiff's physical impairments would cause her to be absent more than three times per month. (T. 570). He also checked "yes" when asked whether plaintiff's impairments would affect walking and would interfere "seriously with the individual's ability to independently initiate, sustain or complete normal activities of daily living." (T. 571).

There is no evidence, medical or otherwise, that supports a finding that plaintiff is unable to initiate or complete normal activities of daily living. Plaintiff cooks, does laundry, shops, does child care, showers and dresses daily, and paints. (T. 418-19). The medical evidence of record often showed that plaintiff had normal, or almost normal,

orthopedic findings.[14] (T. 551, 556, 716-17, 722, 748-49, 768, 1072-73). On April 26, 2016, plaintiff told CNP Rosman that her back pain was moderate to severe, and that it had lasted a "year." (T. 1257). Plaintiff described the pain as worsening, radiating toward the chest, aching, burning, sharp and shooting, and aggravated by a variety of activities. (*Id.*) Plaintiff also stated that she had decreased mobility and tenderness. However, CNP Rosman noted that the "[s]ymptoms are relieved by pain meds/drugs." (T. 1257). CNP Rosman assessed chronic right-sided thoracic pain, but suggested warm soaks, muscle rubs, light stretching, massage, NSAIDS, and "Muscle Relaxer as needed." (T. 1262). His recommendation was to "[a]void heavy lifting/use good body mechanics." (*Id.*)

Dr. Magurno's March 19, 2012 consultative report also contradicts Dr. Wiesner's assessed limitations. Although there were some musculoskeletal limitations in plaintiff's cervical and lumbar spine, Dr. Magurno found full range of motion in plaintiff's shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally, with "questionable instability of the left knee." (T. 420). Dr. Magurno found normal reflexes in the upper and lower extremities, with no sensory deficits noted, and 5/5 strength in the upper and lower extremities, except for the left quadriceps and hamstrings which was 4/5. (*Id.*) Dr. Magurno stated that, although plaintiff had a prescription for a cane, it was "not medically necessary," based on the doctor's own examination. (T. 421).

Dr. Magurno stated that plaintiff had "moderate limitations for fine and gross

---

[14] These normal findings include full ranges of motion in most joints.

motor skills involving the hands, moderate limitations for squatting and bending, and "mild" limitations for standing and walking due to her knee arthritis. (*Id.*) Although plaintiff argues that no "adverse inference" may be made from the failure of a medical provider to include the need for a sit-stand option, Dr. Magurno was specifically assessing plaintiff's abilities. Not only did she omit a the requirement for a "sit-stand option," she omitted any limitation on sitting at all, and only assessed a "mild" limitation for standing and walking.

In *Hawley v. Colvin*, No. 3:13-CV-397, 2014 WL 3107967, at *3 (N.D.N.Y. July 8, 2014), the court held that the ALJ could not interpret from a doctor's "silence about functional limitations . . . that there are or are not such limitations." In this case, Dr. Magurno was not "silent" about plaintiff's limitations. She specifically mentioned her assessment of the plaintiff's functional limitations, but never mentioned any limitation on her ability to sit or the necessity to change positions frequently or "at will."

The ALJ specifically rejected the necessity for the "sit/stand" requirements found in the reports by Dr. Bouali, CNP Rosman, Dr. Wiesner. (T. 823-84). The ALJ also rejected their opinions regarding plaintiff's excessive absences as well as the finding that medication side effects would disrupt plaintiff's ability to concentrate or sustain work pace. (*Id.*) These medical providers all answered questionnaires indicating that the plaintiff would be required to change positions frequently. All the providers had different opinions regarding the length of time that plaintiff could stay in one position. (T. 570 (every ten minutes); 710-11 (every thirty minutes); and 17-18 (every hour)). In his March 22, 2013 report, Dr. Wiesner also found that plaintiff's concentration would

be moderately affected by plaintiff's medical condition or the side effects of her medications, and her concentration would be markedly affected. (T. 571).

The ALJ extensively discussed the basis for his findings regarding plaintiff's need to change positions. (T. 824-25). The ALJ's determination to give little weight to Dr. Wiesner's report is supported by substantial evidence, given the inconsistencies between the answers contained in the "questionnaires," and the evidence showing that plaintiff's physical examinations often produced normal findings, and plaintiff could perform many activities of daily living. *See Smith v. Berryhill*, No. 17-2005, __ F. App'x __, 2018 WL 3202766, at *2-3 (2d Cir. June 29, 2018) (ALJ properly rejected opinions regarding plaintiff being "off task" or absent when the opinions lacked support in their own treatment notes and other evidence of record).

On August 9, 2013, CNP Rosman stated that plaintiff could sit for 6 hours and walk for 4 hours in an 8-hour day in addition to stating that plaintiff would have to change position every hour. (T. 1049). However, in the same report, he also found that plaintiff could lift "over 10 pounds" for 3-8 hours per day. (*Id.*) CNP Rosman added a hand-written note at the end of this questionnaire which appears to state,[15] in part, that "[f]rom a primary care perspective . . . may work - Pt states disability . . . Psychiatric and Rheumatologic - if so disability needs to come from them." (T. 1049). FNP Rosman makes it clear that he is only treating plaintiff for her HIV condition. Thus, the ALJ was justified in giving FNP Rosman's assessment of plaintiff's need to have more than one ten minute rest period per hour or change positions every hour little weight.

---

[15] CNP Rosman's handwriting is almost illegible. The court has attempted to discern what he wrote, and what he may be attempting to say.

With respect to medication side effects,[16] plaintiff told Dr. Wiesner that her medications caused her nausea, sleepiness, fatigue, and difficulty concentrating. However, in a treatment note, signed by NP Miller on February 7, 2013 (less than one month before Dr. Wiesner's report), NP Miller listed "medication side effects" under the heading "pertinent negatives," indicating that plaintiff was not having adverse side effects from her medications.[17] She also stated that plaintiff was able to tolerate her medications well.[18] (T. 553).

NP Miller repeated this assessment on February 28, 2013. (T. 719). In fact, NP Miller indicates that plaintiff was taking Prednisone and Plaquenil for her rheumatoid arthritis, but discontinued them for several years. (T. 719). On February 28, 2013, plaintiff told NP Miller that she had not experienced any problems with the RA "until 2 weeks ago," when she notice left knee, hand/finger, and neck pain. She began taking Prednisone again on February 13, 2013 "with improvement of symptoms." (T. 719). Plaintiff was "[u]sing tramadol/robaxin for the pain with some relief." (*Id.*) Her physical examination on February 28, 2013 showed full range of motion without joint deformity, heat, swelling, erythema or effusion. (T. 722). Plaintiff indicated that she

_____

[16] This court has already discussed whether the ALJ had substantial evidence, supporting his finding that the side effects of medication, to the extent that plaintiff suffered from such side effects, affected her ability to concentrate and stay on task. This section also discusses whether such side effects existed in addition to their potential effect on plaintiff's ability to work.

[17] The court notes that when plaintiff did experience adverse side effects from medications, she discontinued them. (T. 418). Dr. Magurno stated that one of plaintiff's HIV medications was making her anxiety worse, so "now the treatment is watchful waiting." (*Id.*)

[18] The court would also point out that, at the second hearing, plaintiff testified that she was not taking any prescription medications on a regular basis, and only took them when the pain was severe, which happened approximately once per month. (T. 845).

had pain in her right ankle. (*Id.*)

As stated above, conflicts in the evidence are for the ALJ to resolve, and a treating provider's opinion, particularly when it is expressed in a "check box" questionnaire, may be given less weight when it is contradicted by substantial evidence in the record. The ALJ's determination to give the opinions of these providers regarding a "sit/stand" option and the effect of medication less weight is supported by substantial evidence.

### 3. Manipulative Limitations

Plaintiff also argues that the ALJ erred in his analysis of plaintiff's manipulative limitations, and that the ALJ did not comply with the Appeal's Council remand because he only engaged in "some limited discussion of Plaintiff's hands," but did not point to any medical opinion supporting the conclusion that plaintiff could "occasionally" perform fine manipulations as well as grasp, hold, turn, raise, and lower objects." (Pl.'s Br. at 19). However, this court does not agree.

The Appeals Council remanded this case to the ALJ for further analysis of plaintiff's inability to perform certain manipulations with her hands. (T. 898). The Appeals Council reasoned that many unskilled light work jobs require the use of arms and hands to grasp and to hold and turn objects. The ALJ's initial decision did not explain how the "moderate limitations" assessed by Dr. Magurno were consistent with the RFC finding. (*Id.*)

On remand, the ALJ still gave Dr. Magurno's opinion great weight, and found that plaintiff could not perform "frequent fine manipulation." The ALJ accepted that

plaintiff had some manipulative limitations based on Dr. Magurno's report. However, the ALJ also noted that plaintiff's physical examinations consistently showed full range of motion of both of the plaintiff's hands, intact finger dexterity, and full bilateral grip strength. (T. 328, 338, 421, 822-23). The ALJ cited a December 2011 EMG and nerve conduction study which was generally "unremarkable," in that there was no evidence of carpal tunnel or cubital tunnel syndrome or neuropathy.[19] (T. 338-39, 822). In addition, there was no radiographic evidence of rheumatoid arthritis. (T. 317, 822). Thus, the ALJ's finding that plaintiff could "occasionally" perform fine manipulations or grasp, hold, turn, raise, and lower objects is supported by substantial evidence.

## VII.  STEP FIVE DETERMINATION

### A.    Legal Standards

At step five of the disability analysis, the burden shifts to the ALJ to demonstrate that there is other work in the national economy that plaintiff can perform. *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). If the ALJ utilizes a VE at the hearing, the VE is generally questioned using a hypothetical question that incorporates plaintiff's limitations. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981). Although the ALJ is initially responsible for determining the claimant's capabilities based on all the evidence, *see Dumas v. Schweiker*, 712 F.2d 1545, 1554 n.4 (2d Cir. 1983), a

---

[19] The plaintiff underwent the electrodiagnostic consultation because of pain in her neck which was associated with some numbness and intermittent weakness of her left arm and hand. (T. 338-39). The result of the study was normal, and the result of the physical examination showed normal range of motion in both upper limbs, strength test was "good to normal" throughout aside from questionable slight weakness of the left long finger flexors. (T. 338). Spurling's test to determine nerve root pain was "equivocally positive bilaterally." (*Id.*) While there was "possible C-7 and/or C-8 radiculopathy, there was no sign of acute denervation, and there was no evidence of carpal or cubital tunnel syndromes, nor any other left upper limb focal or diffuse neuropathy. (T. 339).

hypothetical question that does not present the full extent of a claimant's impairments cannot provide a sound basis for vocational expert testimony. *See De Leon v. Sec'y of Health and Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984); *Lugo v. Chater*, 932 F. Supp. 497, 503-04 (S.D.N.Y. 1996). Conversely, the ALJ may rely on a VE's testimony regarding the availability of work as long as the hypothetical facts the expert is asked to consider are based on substantial evidence and accurately reflect the plaintiff's limitations. *Calabrese v. Astrue*, 358 F. App'x 274, 276 (2d Cir. 2009). Where the hypothetical is based on an RFC analysis supported by substantial facts, the hypothetical is proper. *Id*. at 276-277.

### B. Application

In the his first decision, the ALJ relied on Dr. Magurno's consultative report which stated that plaintiff would have "moderate" limitations in both fine and gross motor skills involving the hands. However, the ALJ did not use a VE in the first hearing. The Appeals Council remanded the case because the ALJ did not explain how these "moderate limitations are consistent with the [RFC] finding" and noted that many unskilled light work jobs required the use of the hands and arms to grasp and hold objects. (T. 898). The use of a VE, "if warranted," was included in the Appeal's Council remand order. (T. 899).

On remand, the ALJ used the VE to determine whether work would be available to an individual with plaintiff's specific limitations. VE Margaret Heck was first asked whether there would be unskilled light work jobs available for an individual with the plaintiff's mental limitations and assuming that plaintiff should ***not*** perform frequent

fine manipulations such as repetitive hand/finger actions, fingering or feeling with both hands, but she retained the ability to grasp, hold, turn, raise and lower objects with either hand. (T. 853). The VE testified that there were light work jobs available. (T. 854). The ALJ then added an additional limitation by asking the VE whether the availability of jobs would be affected if plaintiff could ***not*** frequently grasp, hold, turn, raise, and lower objects with either hand. (T. 855). The VE stated that the availability of unskilled jobs would ***not*** be affected even with the additional limitations cited in the second hypothetical question. (*Id.*)

Although the hypothetical question did not track the specific language used in Dr. Magurno's report, it is clear that the second question was consistent with "moderate limitations" in fine and gross motor skills,[20] and consistent with the medical evidence cited above. Thus, contrary to plaintiff's argument, the ALJ did not substitute his opinion of plaintiff's limitations for the medical evidence.

The ALJ relied on the VE's testimony at step five. (T. 25). Because this court has found that the ALJ's RFC determination was supported by substantial evidence, the ALJ properly rejected any additional limitations, and the hypothetical question was appropriate to plaintiff's RFC, the court also finds that the ALJ's determination at step five, and the ultimate determination of disability, are similarly supported by substantial

---

[20] The court does note that the record contains the "deposition" of a different VE - Victor Alberigi, dated August 16, 2013, apparently submitted by plaintiff's counsel, subsequent to the first hearing decision, but prior to the Appeal's Council's decision affirming the ALJ, and prior to the plaintiff's first federal action. (T. 270-77). VE Alberigi testified that, based upon the ALJ's first RFC assessment, together with Dr. Magurno's finding that plaintiff would have "moderate limitations for fine and gross motor skills involving the hands," plaintiff could still perform other light work, but not sedentary jobs. (T. 274-77).

evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that judgment be entered for the **DEFENDANT.**

Dated: August 29, 2018

Hon. Andrew T. Baxter
U.S. Magistrate Judge